# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WISCONSIN

In re:

| | |
|---|---|
| ANADA, INC., | Chapter 11 |
| | Case No. 24-10662 |
| | (Jointly Administered) |
| Debtor. | |

| | |
|---|---|
| OVAINNOVATIONS, LLC, | Chapter 11 |
| | Case No. 24-10663 |
| Debtor. | |

| | |
|---|---|
| CRIMSON HOLDINGS, LLC, | Chapter 11 |
| | Case No. 24-10664 |
| Debtor. | |

**DISCLOSURE STATEMENT TO  JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR ANADA, INC., OVAINNOVATIONS, LLC, AND CRIMSON HOLDINGS, LLC**

# Contents

I.    INTRODUCTION AND OVERVIEW ..................................................................... 3

   A.    PURPOSE OF DISCLOSURE STATEMENT ............................................................... 3

   B.    SOURCE OF INFORMATION ............................................................................... 3

   C.    OVERVIEW OF CHAPTER 11 .............................................................................. 4

II.    DESCRIPTION OF DEBTORS ............................................................................. 5

   A.    THE DEBTORS IN POSSESSION .......................................................................... 5

   B.    THE DEBTOR'S PRINCIPALS AND MANAGEMENT ................................................. 6

   C.    DESCRIPTION OF DEBTORS' BUSINESS AND CAUSES FOR CHAPTER 11 FILING ......... 6

III.    POST-PETITION EVENTS OF SIGNIFICANCE .............................................. 7

   A.    POST-PETITION TRANSFERS OUTSIDE THE ORDINARY COURSE OF BUSINESS ......... 7

   B.    CHAPTER 11 EVENTS AND ORDERS .................................................................... 8

IV.    ASSETS AND LIABILITIES ............................................................................ 13

   A.    SALE PROCEEDS ........................................................................................... 13

   B.    CAUSES OF ACTION ....................................................................................... 13

   C.    SECURED CLAIMS ......................................................................................... 16

   D.    PRIORITY CLAIMS AND ADMINISTRATIVE EXPENSE CLAIMS .............................. 20

   E.    NON-PRIORITY UNSECURED CLAIMS ............................................................... 24

   F.    GUARANTEED DEBT ...................................................................................... 25

V.    IMPLEMENTATION OF PLAN ....................................................................... 25

   A.    FINANCIAL INFORMATION .............................................................................. 25

   B.    TAX RAMIFICATIONS ..................................................................................... 27

VI.    LEGAL REQUIREMENTS ............................................................................... 28

   A.    VOTING PROCEDURES .................................................................................... 28

   B.    ACCEPTANCE ................................................................................................ 29

   C.    CONFIRMATION ............................................................................................. 29

   D.    MODIFICATION .............................................................................................. 29

   E.    EFFECT OF CONFIRMATION ............................................................................ 30

   F.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .............. 30

VII.    RECOMMENDATION AND CONCLUSION .................................................. 31

## I.    INTRODUCTION AND OVERVIEW

### A.    PURPOSE OF DISCLOSURE STATEMENT

OvaInnovations, LLC ("Ova"),[1] Crimson Holdings, LLC ("Crimson"), and Anada, Inc. ("Anada," and together with  Ova and Crimson, the "Debtors"), as Debtors in Possession, jointly with the Committee of Unsecured Creditors of OvaInnovations, LLC ("Ova Committee") and the Committee of Unsecured Creditors of Crimson Holdings, LLC ("Crimson Committee," and with the Ova Committee, the "Committees"). submit this Disclosure Statement pursuant to 11 U.S.C. § 1125 for use in the solicitation of votes on the Joint Chapter 11 Plan of Liquidation for Anada, Inc., OvaInnovations, LLC, and Crimson Holdings, LLC ("Plan"), which was concurrently filed with the Bankruptcy Court.  The Debtor and the Committees are, collectively, the "Plan Proponents" and provide this Disclosure Statement to all of the Debtors' known creditors in order to disclose the information the Plan Proponents deem material, important, and necessary for the Debtors' creditors to arrive at a reasonably informed decision in exercising their right to vote to accept or reject the Plan.

### B.    SOURCE OF INFORMATION

Except as otherwise noted to the contrary herein, this Disclosure Statement and the Plan have been prepared from the Debtors' information.  Neither Committee, nor their respective professionals, has conducted an independent investigation to verify such information.

The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified.  Neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, create an implication that there has been no change to the facts set forth herein since the date of this Disclosure Statement.

---

[1] Unless defined in this Disclosure Statement, all capitalized terms shall have the meaning ascribed to them in the Plan.

**NO PERSON OR ENTITY HAS BEEN AUTHORIZED BY THE PLAN PROPONENTS OR THE COURT TO GIVE ANY INSTRUCTIONS OR MAKE ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THEIR FINANCIAL AFFAIRS, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. YOU SHOULD NOT RELY UPON ANY REPRESENTATIONS, PROMISES, OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT. ANY SUCH REPRESENTATION, INDUCEMENTS, AND/OR PROMISES SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS OR THE COMMITTEES WHO, IN TURN, SHALL DELIVER SUCH INFORMATION FOR SUCH ACTION AS THE COURT MAY DEEM APPROPRIATE.**

      C.      <u>OVERVIEW OF CHAPTER 11</u>

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors, and equity interest holders. In addition to permitting a rehabilitation or liquidation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization or liquidation is the principal objective in a Chapter 11 reorganization case. A plan of reorganization or liquidation sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan of reorganization or liquidation by the Bankruptcy Court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to certain exceptions, the confirmation order for a reorganizing debtor

discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

After a plan of reorganization or liquidation has been filed, the holders of claims against, or interests in, a debtor are permitted to vote to accept or reject the plan.  Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

The Plan Proponents submit this Disclosure Statement to holders of claims against the Debtors and holders of equity interests in the Debtors to satisfy the requirements of Bankruptcy Code section 1125.

## II.    DESCRIPTION OF DEBTORS

### A.    THE DEBTORS IN POSSESSION

On April 8, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Wisconsin, commencing these Bankruptcy Cases.  Since that time, the Debtors have remained in possession of their property and are operating their businesses as debtors in possession pursuant to section 1107 and 1108 of the Bankruptcy Code.  The Debtors' bankruptcy cases are being jointly administered under Anada's bankruptcy case, Case No. 24-10662 (Bankr. W.D. Wis.).

No prepetition intercompany claims exist because (i) none of the Debtors scheduled any intercompany claims on their Schedules and (ii) no Debtor filed a proof of claim asserting any claim against any other Debtor.  *See* Anada Case, ECF No. 63; Crimson Case, ECF No. 43; and Ova Case, ECF No. 42. However, potential postpetition intracompany claims may exist.  *See infra* section III(D)(4).

The Debtors seek to liquidate their remaining assets in these Chapter 11 proceedings and distribute them to creditors pursuant to procedures set forth in the Plan.

### B.    THE DEBTOR'S PRINCIPALS AND MANAGEMENT

Ova and Crimson are Iowa limited liability companies.  Anada is a Delaware corporation.

Anada is the sole member of Ova and the sole member of Crimson.  Anada is partly owned by David

L. Rettig ("Rettig"), who is also Anada's CEO and President and who is authorized to act for the

Debtors in their jointly administered cases.  A complete list of Anada's equity security holders is

on the docket in the Anada Case attached to the bankruptcy petition filed at Docket Number 1.

According to the Plan, the Debtors' current principals and management will be terminated and the

board of directors dissolved.  However, Rettig will remain available to the Liquidation Trustee

(described below) to answer questions and provide information and testimony as and if needed.

### C.    DESCRIPTION OF DEBTORS' BUSINESS AND CAUSES FOR CHAPTER 11 FILING

Except as otherwise noted to the contrary herein, the descriptions contained in this section

of the Disclosure Statement have been prepared from the Debtor's information.

Prior to the sale of substantially all of their Assets, the Debtors were engaged in the

production and supply of inedible egg products for animal food purposes.

### 1.    Crimson's Operations

Crimson operated an egg drying facility in Adrian, Michigan.  The Adrian facility was the

subject of litigation arising from odor and nuisance complaints from residents near the facility.  As

part of that litigation, Crimson was required to limit its hours of operation and install odor mitigating

technology at the Crimson facility.

In addition to litigation with the City of Adrian and the State of Michigan, Crimson was also

sued in a class action lawsuit by Adrian residents in June 2023 ("Class Action").  The Class Action

asserted nuisance claims against Crimson for the odor allegedly caused by its facility.  The Class

Action proceeded to facilitation, but a resolution was not reached before the Petition Date.  No class

was certified in the Class Action.

### 2. Ova's Operations

Ova bought liquid inedible eggs from egg producers and transported those inedible eggs to Crimson. Once Crimson dried the eggs, Ova picked them up and sold them to pet food companies throughout the United States.

On July 29, 2020, Rettig and Ova were sued by IsoNova Technologies, LLC ("IsoNova") in the United States District Court for the Northern District of Iowa, Case No. 20-CV-71-CJW-KEM ("IsoNova Litigation"). The IsoNova Litigation was resolved with a settlement agreement ("Iowa Settlement Agreement") whereby Rettig, his wife, the Debtors, and Anada's non-debtor subsidiaries each agreed to be jointly and severally liable to IsoNova for payments totaling $10,000,000 (if all payments were timely made) or $13,000,000 (if payments under the Iowa Settlement Agreement were not timely made). The Debtors and others secured the amount due under the Iowa Settlement agreement with substantially all of their assets. Pursuant to the Iowa Settlement Agreement, $3,500,000 was transferred to IsoNova by Anada before the Petition Date.

### 3. Anada's Operations

Anada was organized in February of 2022, to act as an investor and obtain investments to become the sole owner of Crimson and Ova. Anada became overleveraged following its entry into the Iowa Settlement Agreement.

## III. POST-PETITION EVENTS OF SIGNIFICANCE

### A. POST-PETITION TRANSFERS OUTSIDE THE ORDINARY COURSE OF BUSINESS

Throughout these Chapter 11 Cases until the sale described in section III(B)(4) of this Disclosure Statement, the Debtors operated in the ordinary course of business. However, there was a post-petition transaction that occurred outside the normal course of business.

The Debtors' insurance policies terminated, and the Debtors sought replacement renewal insurance. Replacement policies were obtained using insurance premium financing. Bankruptcy Code section 364 states that post-petition financing requires Court approval, but the Debtors did not

obtain this authority.  As a result, the insurance policies were cancelled shortly before the Sale, and

the Debtors were issued refunds of the premium payments that had been made.

> **B.    CHAPTER 11 EVENTS AND ORDERS**
>
> > **1.    Employment of Professionals**
> >
> > > a.    On May 1, 2024, the Court authorized the Debtors to employ Krekeler Law, S.C. as their attorneys in these Chapter 11 Cases.  *See* Dkt. No. 68.
> > >
> > > b.    On June 3, 2024, the Court authorized the Debtors to employ Frost, PLLC, as their accountants in these Chapter 11 Cases.  *See* Dkt. No. 128.
> > >
> > > c.    On June 13, 2024, the Court authorized the employment of Richman & Richman LLC as co-counsel for the Committee of Unsecured Creditors of OvaInnovations, LLC.  *See* Dkt. No. 163.
> > >
> > > d.    On June 13, 2024, the Court authorized the OvaInnovations Committee to employ Miller, Canfield, Paddock, and Stone P.L.C. as counsel to the OvaInnovations Committee.  *See* Dkt. No. 164.
> > >
> > > e.    On June 13, 2024, the Court authorized the Crimson Committee to employ Schaefer & Weiner PLLC as counsel to the Crimson Committee. *See* Dkt. No. 165.
> > >
> > > f.    On July 15, 2024, the Court authorized the Debtors to employ the Goosman Law Firm as counsel to the Debtors in these Chapter 11 Cases.  *See* Dkt. No. 188.
> > >
> > > g.    On September 6, 2024, the Court authorized the Debtors to retain SSG Advisors, LLC ("SSG") as their investment banker. *See* Dkt. No. 310.
> >
> > **2.    Cash Collateral/Financing**

Shortly after filing their petitions with the Bankruptcy Court, the Debtors filed several "first

day" motions, including a motion for use of cash collateral and to provide adequate protection for

this use.  *See* Dkt. No. 3 (the "Cash Collateral Motion").  The Cash Collateral Motion was granted

on an interim basis at a hearing held on April 12, 2024.  *See* Dkt. No. 37.  Thereafter, the Court

entered an agreed interim cash collateral order on  April 19, 2024.  *See* Dkt. No. 53.  The Court later

entered an *Agreed Order Approving Final Use of Cash Collateral and Providing Adequate Protection to Secured Creditors* on June 25, 2024 [Dkt. No. 178].

Use of cash collateral was continued through September 20, 2024, upon the *Stipulation for Continued Use of Cash Collateral and Provide Adequate Protection* [Dkt. No. 291] filed with the Court on August 29, 2024. *See* Dkt. No. 294. On September 26, 2024, Debtors filed an *Emergency Stipulation to Continue Use of Cash Collateral to Allow Debtors to Pay Employees* [Dkt. No. 336], which was granted on September 26, 2024. *See* Dkt. No. 341. Thereafter, on October 8, 2024, the Court entered an *Order Approving Emergency Motion to Continue Use of Cash Collateral and Provide Adequate Protection*. *See* Dkt. No. 365.

Because the liens of the Dairy Farmers of America and IsoNova in cash collateral have been released as part of the Sale or avoided and preserved for the Debtors' estates pursuant to the IsoNova Settlement Agreement (defined herein), as will be discussed below, Debtors are permitted to use cash and receivables in the ordinary course of business. However, the Debtors ceased doing business as of October 31, 2024, the date on which its assets were sold.

### 3.    The Automatic Stay and Litigation

The Debtors' Chapter 11 filings immediately gave rise to the Bankruptcy Code's automatic stay which, with limited exceptions, enjoined commencement and continuation of all creditor collection efforts, litigation against any Debtor, and enforcement of liens against the Debtors' property. This relief provided the Debtors with "breathing room" to assess and reorganize their businesses. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until the Plan is confirmed and becomes effective.

#### a.   Balanced Management Litigation

Shortly after these Bankruptcy Cases commenced, Balanced Management, LLC ("BM LLC") sought relief from the automatic stay to recover receivables that it alleged constituted its collateral. *See* Dkt. No. 64. The Debtors, the Committees, and other parties-in-interest disputed

BM LLC's status as a secured creditor. *See* Dkt. Nos. 74, 76, 96, and 110. After a number of preliminary hearings and a final evidentiary hearing, BM LLC withdrew its motion for stay relief. *See* Dkt. No. 177.

b. <u>IsoNova Litigation</u>

The Crimson Committee identified potential causes of action against IsoNova that the Plan Proponents believed could result in avoidance of IsoNova's security interests against the Debtors' assets and recovery of monies that had been paid to IsoNova before the Petition Date. *See* Dkt. No. 289. As a result, the Crimson Committee filed a motion for authority to pursue these causes of action on the Debtors' behalf. *See* Dkt. No. 244. This motion was settled by stipulation between the Debtors and the Committees. *See* Dkt. No. 302.

Thereafter, at the urging of the Committees, on September 9, 2024, Debtors commenced litigation against IsoNova. This litigation sought, among other things, to avoid IsoNova's security interests in the assets of the Debtors on the grounds that they were fraudulent transfers. *See* Case No. 24-00055 (Bankr. W.D. Wis.) (the "<u>Adversary Case</u>"), Dkt. No. 1]. On October 10, 2024, IsoNova filed its Answer in the Adversary Case. *See* Adversary Case, Dkt. No. 11.

Thereafter, the Debtors, the Committees, and IsoNova negotiated a settlement agreement (the "<u>IsoNova Settlement Agreement</u>") to resolve the Adversary Case. On November 26, 2024, the Debtors sought Court approval of the settlement under Federal Rule of Bankruptcy Procedure 9019. *See* Dkt. No. 466. On December 11, 2024, the Court authorized and approved the settlement. *See* Dkt. No. 496.

Under the terms of the IsoNova Settlement Agreement, IsoNova agreed (1) that its asserted security interests in all of the Debtors' assets would be avoided under Bankruptcy Code § 548 and preserved under Bankruptcy Code § 551 for the benefit of the Debtors' estates and their creditors; (2) to withdraw its claims against the Debtors in these chapter 11 cases; and (3) to release the Debtors and other parties from claims related to the Iowa Settlement Agreement. In exchange, the

Debtors released IsoNova and related parties from claims related to the Iowa Settlement Agreement.[2]

### c. Daybreak Litigation

Daybreak Foods, LLC ("Daybreak") also filed a motion for relief from the automatic stay, seeking to set off certain amounts allegedly owed to it by Ova against amounts it owes to Ova. *See* Dkt. No. 386. Daybreak's motion remains pending. The Debtors and Daybreak have agreed to participate in mediation to resolve this dispute. *See* Dkt. No. 531. Mediation before Judge Michael Slade is set for March 12, 2025.

### d. Dairy Farmer of America Potential Litigation

Dairy Farmers of America, Inc. ("DFA") held a first priority mortgage on Crimson's real estate. DFA asserted a $2,265,000 secured claim against Crimson related to Crimson's purchase of the real estate. *See* Crimson Case, Proof of Claim No. 16. Prior to the Petition Date, the interest rate has been 0%, and Crimson had not been in default of its agreement. Indeed, Crimson's only default under its agreement with DFA was the filing of its bankruptcy case.

In connection with the Sale (described in the next subsection), DFA provided the Debtors with a payoff letter asserting $2,391,508.47 was due, which included post-petition interest of $252,739.56.accruing at the rate of 15% per year. The Debtors paid the amounts claimed due by DFA at closing of the Sale with an agreement between Debtors, DFA, and the Committees that DFA would hold in escrow the amount of the post-petition interest that remains in dispute. In December of 2024, DFA refunded the Debtors $61,650.25. Consequently, the amount still in dispute with respect to DFA is $191,079.31

---

[2] It is important to note that IsoNova's releases in the IsoNova Settlement Agreement do not extend to Rettig, Jennifer Rettig, or any Non-Debtor Entity (as that term is defined in the IsoNova Settlement Agreement).

The Crimson Committee asserts that DFA is not entitled to any post-petition interest under 11 U.S.C. § 506(b).[3]  The Debtors and DFA have engaged in settlement discussions to resolve this dispute.  The Crimson Committee has made a demand that the Debtors sue DFA to recover the improperly paid post-petition interest if it is not returned.  This litigation has not yet commenced because the Plan Proponents hope that the dispute will be resolved as part of the plan solicitation and confirmation process.  If not, however, litigation may be required to resolve this dispute.

**4.      Use of Property Outside the Ordinary Course of Business:**

Section 363(b) of the Bankruptcy Code authorizes debtors to seek bankruptcy court approval to lease, use, or sell property of the bankruptcy estates outside of the ordinary course of their businesses.  During the course of these Chapter 11 Cases, the Debtors sought and received Bankruptcy Court permission to sell substantially all of their assets free and clear of all liens and encumbrances ("Sale").  The Debtors set up a marketing process to market their assets.  Veos USA, Inc. ("Veos") submitted the initial bid for the Debtors' assets and became the "stalking horse bidder" that subsequent bidders would need to outbid in order to purchase the Debtors' assets.  No other qualified bids were received, and thus the Debtors sold their assets to Veos.  The process by which this occurred is described below.

On September 12, 2024, the Court entered the *Stipulated Order (I) Approving Veos USA as Stalking Horse Bidder, (II) Authorizing the Debtors' Entry into an Asset Purchase Agreement, (III) Authorizing the Sale of the Debtors' Assets Free and Clear of All Encumbrances, (IV) Approving the Assumption and Assignment of Certain Executory Contracts, (V) Approving Certain Bid Procedures, Bid Protections and Deadlines, (VI) Scheduling a Sale Hearing, and (VII) Granting Related Relief* [Dkt. No. 319] (the "Bid Procedures Order").  Debtors employed investment banker SSG, who conducted a thorough marketing process to identify other potential bidders on the

---

[3] *See, e.g., In re Bownetree*, LLC, No. 1-08-45854, 2009 Bankr. Lexis 2295, 2009 WL 2226107 (Bankr. E.D.N.Y. July 24, 2009); *In re Residential Capital, LLC*, 508 B.R. 851 (Bankr. S.D.N.Y 2014).

Debtors' assets.  After a marketing period, no other qualifying bids were made for the Debtors'

assets, and consequently Veos was deemed the successful bidder for the assets of the Debtor.

On October 28, 2024, the Court entered the *Stipulated Order (A) Approving Veos, USA, Inc.
as the Successful Bidder, (B) Authorizing the Sale of the Purchased Assets of the Debtors Free and
Clear of all Claims, (C) Approving the Assumption and Assignment of the Assumed Contracts, and
(D) Granting Related Relief* [Dkt. No. 423] ("Sale Order").  The Sale closed on October 31, 2024,
and following the closing, the Debtors ceased operating.  However, Ova continues to collect
receivables owed to it by its customers and proceeds of a Liquid Egg Supply Agreement with
Daybreak.

Other than the proceeds of the sale, Causes of Action and any proceeds thereof, and certain
retained contract rights which are described more fully in the Plan, the Debtors are not aware of any
other material assets of the Debtors that may be available in these Chapter 11 Cases.

On December 5, 2024, the Debtors filed their *Letter to Court Regarding Closing
Statements* [ECF No. 480], which asserted certain allocations of the purchase price amongst the
Debtors.  One or more of the Committees has disputed the Debtors' allocation of the purchase price
amongst the Debtors.  To resolve disputes regarding the allocation of the purchase price amongst
the Debtors, certain alleged post-petition intracompany claims, the pre-and post-petition operation
of the Debtors' business and avoid potentially costly litigation over those issues, the Plan
Proponents agreed to the creditor treatment in the Plan

## IV.    ASSETS AND LIABILITIES

### A.    SALE PROCEEDS

The Debtors' principal asset is the Sale proceeds.  These will be used to fund the Plan.

### B.    CAUSES OF ACTION

The Debtors and the Liquidation Trustee reserve the right to collect all accounts receivable
and all other amounts due to the Debtors for any reason whatsoever, whether owed to the Debtors

pursuant to contract rights, quasi contract, tort law, refund rights, deposits, or for any other reason, including, without limitation, any claims against (i) current and former officers, directors, members or managers of any of the Debtors, including Rettig, involving or related to the prepetition or post-petition operation of the business and/or the decision to file these Chapter 11 Cases; (ii) current and former members of the Debtors' board of directors involving or related to the prepetition operation of the business and/or the decision to file these Chapter 11 Cases; (iii) current and former members and/or shareholders of the Debtor(s) involving or related to the prepetition or post-petition operation of the business of the Debtors and/or the decision to file these Chapter 11 Cases; (iv) any insurance company insuring any of the forgoing and/or the Debtor(s) including, without limitation, under any director and officers insurance policy of the Debtor(s); (v) claims against Daybreak involving or related to any contract or otherwise between any Debtor and Daybreak or its affiliates; (vi) claims of any nature whatsoever against DFA including, without limitation, to recover improperly paid post-petition interest, (vii) claims against Veos under, involving, or related to the purchase agreement and/or the Sale, and (viii) claims against Balanced Management, LLC and/or its Representatives whether in contract, at law, or in equity including claims that arose prior to and after the Petition Date.

The Debtors and the Liquidation Trustee also reserve the right to pursue any cause of action related to transfers made by or on behalf of the Debtors prior to the Petition Date, including but not limited to preference and fraudulent transfer claims, other than those expressly released by the Plan or by settlements approved by the Bankruptcy Court. Notwithstanding the forgoing, such Claims may be sold, transferred, waived, or released by the Liquidation Trustee.

The Debtors reserve all setoff and recoupment rights of all kinds.

The Debtors reserve the right to commence Avoidance Actions unless expressly waived or released in the Plan, including without limitation, all transfers to or for the benefit of creditors listed on any of the Debtors' filed Statements of Financial Affairs.

Accordingly, the Debtors may have potential Causes of Action and reserve their rights to bring a lawsuit against any entity listed on the Debtor's Schedules (as filed with the Bankruptcy Court and as may be amended) as owing a debt to any Debtor, and any entity listed on their Statements of Financial Affairs.  More specifically, and without waiving any other Claim, the Debtors may seek to avoid from any direct or indirect transferee (i) under section 547 of the Code, any transfer of an interest of any Debtor in property, including all payments to vendors and suppliers, which occurred within 90 days of the Petition Date, or, for Insiders of any Debtor, within one year of the Petition Date; (ii) under sections 544(a) and 545, any liens asserted against any Debtor; (iii) under sections 544(b) and 548, any actual or constructive fraudulent transfers or obligations, and (iv) under section 549, any unauthorized post-petition transactions.

The Debtors generally reserve any and all potential Causes of Action to recover accounts receivable, to enforce contractual obligations, or to otherwise enforce and protect their rights. Currently, the Debtors have not investigated any potential Causes of Action or Avoidance Actions and cannot make any representation concerning their value.  Except as otherwise provided in this Disclosure Statement, the Debtors are unable to estimate what, if anything at all, will be recovered on account of the Avoidance Actions or Causes of Action.[4]  The Plan, if confirmed, will enable the Liquidation Trustee to settle or resolve all Avoidance Actions and Causes of Action.

---

[4] *See, e.g., Kaye v. A.R.E. Distrib. & Alpine Records, LLC (In re Value Music Concepts, Inc.)*, 329 B.R. 111, 121 (Bankr. N.D. Ga. 2005) ("An analysis of avoidance actions must be included in a chapter 7 liquidation analysis only if they are also included in the projection of the chapter 11 result.").

For the avoidance of doubt, there are no reserved claims against IsoNova, and the definitions of Claims, Causes of Action, and Avoidance Action do not include any claim which the Debtors had against IsoNova which was released pursuant to the IsoNova Settlement Agreement.

**C.**     **SECURED CLAIMS**

**1.**     **Secured Claims Against Crimson**

DFA asserted a first priority secured claim against Crimson in the amount of $2,265,000 and secured by Crimson's Real Estate. *See* Crimson Case, Proof of Claim No. 16. DFA released its secured claim upon payment of its claim in the Sale. The Debtors and the Committees assert that DFA was overpaid by the Debtors in the Sale. DFA's Claim shall be treated in accordance with Article III, Section 3.3 of the Plan.

IsoNova asserted a second priority mortgage in Crimson's Real Property and a first priority security interest all of Crimson's other assets in the amount of $9,500,000. *See* Crimson Case, Proof of Claim No. 20. Pursuant to the IsoNova Settlement Agreement, IsoNova's secured claim against Crimson was avoided under section 548 of the Bankruptcy Code and preserved for the benefit of Crimson's estate pursuant to section 551 of the Bankruptcy Code. *See* ECF Nos. 466 and 496. As a result, IsoNova no longer has a secured claim against any of the Debtors.

CSC Leasing Co. ("CSC") asserted a security interest in (i) certain personal property leased to Crimson and (ii) a security deposit of $173,384.00. *See* Crimson Case, Proof of Claim No. 23. CSC's claims against Crimson were resolved by stipulated agreement, which is awaiting approval by order of the Bankruptcy Court. *See* Dkt. Nos. 555. When approved, CSC will have an unsecured claims against Crimson, Ova, and Anada and no longer will have a secured claim against any of the Debtors.

Advantage Electric Services, LLC ("AES") asserted a $84,602.01 claim against Crimson secured by a third priority lien on the Real Estate. *See* Crimson Case, Proof of Claim No. 25. The Debtors and the Crimson Committee discussed this claim with AES in light of the value of

Crimson's assets and the IsoNova liens which have been preserved for the benefit of the Debtors'

estates.  AES and the Plan Proponents agreed that the AES claim should be allowed as an unsecured

claim, and accordingly, it will be treated as a Class VI unsecured claim against Crimson.

### 2.    Secured Claims Against Ova

IsoNova asserted a first priority security interest all of Ova's assets in the amount of

$9,500,000.  *See* Ova Case, Proof of Claim No. 20.  Pursuant to the IsoNova Settlement Agreement,

IsoNova's secured claim against Ova was avoided under section 548 of the Bankruptcy Code and

preserved for the benefit of Ova's estate pursuant to section 551 of the Bankruptcy Code.  *See* ECF

Nos. 466 and 496.  As a result, IsoNova no longer has a secured claim against any of the Debtors.

DFA asserted a secured claim against Ova in the amount of $2,265,000 and secured by

Crimson's Real Estate.  *See* Ova Case, Proof of Claim No. 18.  Ova does not own Crimson's real

estate, however, and Crimson's real estate has been sold.  Because DFA has no claim against Ova

directly, its claim against Ova will receive no distribution under the Plan.

BM LLC asserted a secured claim in against Ova in the amount of $1,917,000, asserting that

it purchased Anada's accounts receivable.  *See* Section III.B.3(a) above.  This claim is unsecured,

however, because (i) the January 23, 2024, UCC-1 filed by BM LLC and attached to Ova Case,

Proof of Claim No. 7 as Part 3 ("BM Ova UCC") was filed with the Wisconsin Department of

Financial Institutions and not in Iowa, where Ova is organized; (ii) the BM Ova UCC was filed

fewer than 90 days prior to the Petition Date and thus would have been avoidable as a preferential

transfer under 11 U.S.C. § 547 had it been filed properly in Iowa; and (iii) even if the BM Ova UCC

had been filed properly in Iowa and were not avoidable as a preference, it was filed subsequent to

the August 10, 2023, UCC-1 filed by IsoNova in Iowa, and thus any lien BM LLC could have

obtained would have been junior to the IsoNova lien, which lien encompassed substantially all of

the Ova estate's assets and which lien was avoided under 11 U.S.C. § 548 and preserved for the

benefit of the Ova estate under 11 U.S.C. § 551 (*see* Docs 466, 496).  Thus, there is no circumstance

under which BM LLC's claim against Ova is secured.  Further, in addition to being unsecured, BM LLC's claim against Ova is invalid because Ova is a separate legal entity from Anada and did not enter into any contract with BM LLC.  Accordingly, the secured claim of BM LLC is placed in Class IV of the Plan, where it will receive no distribution and will be disallowed and expunged.

J&R Management Co. initially asserted a $300,000 Secured Claim against Ova for "Money invested and money loaned (with interest)." *See* Ova Case, Proof of Claim No. 8-1.  This claim was amended to state a $50,000 secured claim and a $250,000 unsecured claim against Ova.   The $50,000 secured claim is purportedly secured by "25,000 pounds of dried inedible inventory from OvaInnovations" allegedly sold to Jeffrey Rettig on December 15, 2023.  *See* Ova Case, Proof of Claim No. 8-2.  However, all of Ova's inventory was sold as part of the Sale, and neither J&R Management Co. nor Jeffrey Rettig objected to that sale.  Accordingly, if this claim is valid, it is unsecured.  Accordingly, it is placed in Class VII with all other unsecured claims against Ova.

CSC asserted a security interest in a security deposit of $173,384.00.  *See* Ova Case, Proof of Claim No. 25.  CSC's claims against Ova were resolved by stipulated agreement, which is awaiting approval by order of the Bankruptcy Court.  *See* Dkt. Nos. 555.  When approved, CSC will have an unsecured claims against Crimson, Ova, and Anada and no longer will have a secured claim against any of the Debtors.

316 WWA, LLC asserted a secured claim against Ova by virtue of a security deposit it was holding.  *See* Ova Case, Proof of Claim No. 47.  By agreed order between the Debtors and 316 WWA, LLC, 316 WWA, LLC received permission to set off this security deposit against its claim. *See* Dkt. No. 346.  Accordingly, 316 WWA, LLC no longer has a secured claim against Ova.

### 3.    Secured Claims Against Anada

On the Petition Date, IsoNova asserted a first priority security interest all of Anada's assets in the amount of $9,500,000.  *See* Anada Case, Proof of Claim No. 9.  Pursuant to the IsoNova Settlement Agreement, IsoNova's secured claim against Anada was avoided under section 548 of

the Bankruptcy Code and preserved for the benefit of Anada's estate pursuant to section 551 of the Bankruptcy Code. *See* ECF Nos. 466 and 496. As a result, IsoNova no longer has a secured claim against any of the Debtors.

BM LLC asserted a secured claim against Anada in the amount of $1,917,000, asserting that it purchased Anada's accounts receivable. *See* Section III.B.3(a) above. This claim is unsecured, however, because (i) the January 23, 2024, UCC-1 filed by BM LLC and attached to Anada Case, Proof of Claim No. 4 as Part 3 ("BM Anada UCC") was filed with the Wisconsin Department of Financial Institutions and not in Delaware, where Anada is organized; (ii) the BM Anada UCC was filed fewer than 90 days prior to the Petition Date and thus would have been avoidable as a preferential transfer under 11 U.S.C. § 547 had it been filed properly in Delaware; and (iii) even if the BM Anada UCC had been filed properly in Delaware and were not avoidable as a preference, it was filed subsequent to the August 10, 2023, UCC-1 filed by IsoNova in Iowa, and thus any lien BM LLC could have obtained would have been junior to the IsoNova lien, which lien encompassed substantially all of the Anada estate's assets and which lien was avoided under 11 U.S.C. § 548 and preserved for the benefit of the Anada estate under 11 U.S.C. § 551 (*see* Dkt. Nos. 466, 496). Thus, there is no circumstance under which BM LLC's claim against Anada is secured. Accordingly, the secured claim of BM LLC is placed in Class V of the Plan, where it will be treated as an unsecured claim against Anada.

CSC asserted a security interest in a security deposit of $173,384.00. *See* Anada Case, Proof of Claim No. 11. CSC's claims against Anada were resolved by stipulated agreement, which is awaiting approval by order of the Bankruptcy Court. *See* Dkt. Nos. 555. When approved, CSC will have an unsecured claims against Crimson, Ova, and Anada and no longer will have a secured claim against any of the Debtors.

-19-

316 WWA, LLC asserted a secured claim against Anada by virtue of a security deposit it was holding.  *See* Anada Case, Proof of Claim No. 12.  By agreed order between the Debtors and 316 WWA, LLC, 316 WWA, LLC received permission to set off this security deposit against its claim.  *See* Dkt. No. 346.  Accordingly, 316 WWA, LLC no longer has a secured claim against Anada.

D.    <u>**PRIORITY CLAIMS AND ADMINISTRATIVE EXPENSE CLAIMS**</u>

The Allowed Priority Claims and Administrative Expense Claims will be paid under the Plan or as otherwise agreed with each claimant.  The Plan Proponents reserve all rights and objections with respect to any Priority Claim or Administrative Expense Claim.  The Plan Proponents believe that each of the Debtors have the following priority claims and administrative claims asserted against them; however, the below amounts are only estimates and actual amounts may be higher or lower and those fees and expenses may continue to accrue until the Effective Date.

1.    <u>Crimson</u>

a.    <u>Priority Claims</u>

The only priority claims asserted against Crimson were two asserted by the Internal Revenue Service ("<u>IRS</u>").  However, it does not appear that either claim is valid.  IRS proof of claim number 4, which originally asserted a priority claim, was amended to show a $0 claim.  *See* Crimson Case, Proof of Claim 4-1.  Likewise, the IRS filed proof of claim number 36, asserting a $555.52 priority claim.  The Court, however, filed a notice at Docket Number 101 stating that this claim had been filed on an outdated or non-official form and requiring a corrected claim to be filed by September 27, 2024.  No corrected claim was filed by the deadline.  Thus, there are no valid priority claims asserted against Crimson.

b.    <u>Administrative Expense Claims</u>

The Administrative Expense Claims against Crimson are as follows:

- CSC asserted a $421,262.42 administrative expense claim related to unpaid post-petition amounts for leased equipment. *See* Dkt. Nos. 500, 555. The Plan Proponents initially disputed this claim, but have reached resolution with CSC. *See* Dkt. Nos. 555. As part of that resolution, and when approved, CSC will be paid $250,000. Thus, CSC no longer holds an administrative expense claim.

- Camber Road Partners ("Camber Road") asserted a $514,525.66 claim against the Debtors. *See* Dkt. No. 506. The Plan Proponents initially disputed the amount of that claim, but this dispute has also been resolved. As part of that resolution, Camber Road will hold a $360,000 administrative expense claim, jointly and severally, against the Debtors. *See* Dkt. Nos. 547.

- It is anticipated that Krekeler Law will assert a claim for accrued but unpaid professional fees of approximately $44,457. Any claim asserted by Krekeler Law will be subject to review by the United States Trustee and approval by the Bankruptcy Court.

- It is anticipated that Goosman Law Firm will assert a claim for accrued but unpaid professional fees of approximately $34,734. Any claim asserted by Goosman Law will be subject to review by the United States Trustee and approval by the Bankruptcy Court.

- It is anticipated that Schafer & Weiner PLLC will assert a claim for accrued but unpaid professional fees of approximately $148,324 for its work in support of the Committee of Unsecured Creditors of Crimson Holdings, LLC. Any claim asserted by Schafer will be subject to review by the United States Trustee and approval by the Bankruptcy Court.

- It is anticipated that Crimson will owe quarterly fees to the United States Trustee, but the amount has not yet been determined.

- The bar date for asserting administrative expense claims has not passed. Additional administrative expense claims may yet be filed.

**2.**     <u>Ova</u>

    a.   <u>Priority Claims</u>

- The Massachusetts Department of Revenue filed a priority claim for $951.63 (*see* Ova Case, Proof of Claim 4), but later withdrew it. *See* Dkt. No. 95.

- BM LLC filed a $1,917,000 priority claim, but this is invalid for the reasons stated in section IV.C.2 above.

- Opal Foods Co-Op, Inc. ("Opal") and Hillendale Farms ("Hillendale") each assert a priority claim. Opal asserts a priority claim of $2,256. Ova Case, Proof of Claim 9. Opal's basis for its claim is that it delivered goods to Ova in the twenty days prior to the Petition Date, and thus has an administrative

expense claim under 11 U.S.C. § 503(b)(9).  Likewise, Hillendale asserts a priority claim of $21,728.  Hillendale does not specify the basis for the priority, but it appears also to be seeking an administrative expense claim.  A creditor generally may not use a proof of claim to assert an administrative expense claim; however,[5] if either Opal or Hillendale timely and properly files a motion to assert an administrative expense claim, Ova will evaluate the request.  Until that time, however, neither creditor has properly asserted either an administrative expense claim or a priority claim against Ova.

- The IRS has asserted a $43,753.50 priority claim against Ova.  *See Ova Case,* Proof of Claim No. 12.  This claim will be paid within thirty (30) days after the Effective Date.  The IRS asserted a second priority claim for $1,111.04 against Ova (*see Ova Case,* Proof of Claim No. 45), but the Court sent a deficiency notice regarding this claim (*see* Dkt. No. 86) and set September 27, 2024, as the deadline to file a corrected claim.  No corrected claim was filed regarding the IRS's $1,111.04 claim, and so this second claim is invalid.

### b.  Administrative Expense Claims

The Administrative Expense Claims against Ova are as follows:

- eShipping, LLC has an Allowed $15,821 administrative claim against Ova. *See* Dkt. No. 424.

- Camber Road asserted a $514,525.66 claim against the Debtors.  *See* Dkt. No. 506.  The Plan Proponents initially disputed the amount of that claim, but this dispute has also been resolved.  As part of that resolution, Camber Road will hold a $360,000 administrative expense claim, jointly and severally, against the Debtors. *See* Dkt. Nos. 547.

- 316 WWA, LLLC has a $57,404 Administrative Claim against Ova. *See* Dkt. No. 462.

- Hovde Building, LLC has a $6,406 Administrative Claim against Ova.  *See* Dkt. No. 462.

- It is anticipated that Krekeler Law will assert a claim for accrued but unpaid professional fees of approximately $51,145.  Any claim asserted by Krekeler Law will be subject to review by the United States Trustee and approval by the Bankruptcy Court.

- It is anticipated that Miller, Canfield, Paddock and Stone, P.L.C. will assert a claim for accrued but unpaid professional fees of $198,239 for its work in support of the Committee of Unsecured Creditors of OvaInnovations, LLC.

---

[5] *E.g., In re Taco Bueno Restaurants, Inc.,* 606 B.R. 289, 298 (Bankr. N.D. Tex. 2019) ("[A] creditor filing a proof of claim containing an administrative expense in the court's claims register is not and cannot constitute a request for allowance and payment on an administrative claim.  Filing a proof of claim containing an administrative expense request is simply insufficient for a creditor to satisfy its obligation under § 503(a) to timely file and serve a request for payment of an administrative claim[.]").

Any claim asserted by Miller Canfield will be subject to review by the United States Trustee and approval by the Bankruptcy Court.

- It is anticipated that Richmond & Richmond, LLC will assert a claim for accrued but unpaid professional fees of $23,003 for its work in support of the Committee of Unsecured Creditors of OvaInnovations, LLC. Any claim asserted by Richmond will be subject to review by the United States Trustee and approval by the Bankruptcy Court.

- It is anticipated that Goosman Law Firm will assert a claim for accrued but unpaid professional fees of approximately $61,495. Any claim asserted by Goosman Law will be subject to review by the United States Trustee and approval by the Bankruptcy Court.

- Eggs R Us has filed a motion asserting an administrative claim in the amount of $130,091.05. *See* Dkt. No. 539.

- It is anticipated that Ova will owe quarterly fees to the United States Trustee, but the amount has not yet been determined.

- The bar date for asserting administrative expense claims has not passed. Additional administrative expense claims may yet be filed.

### 3.    Anada

a.    Priority Claims

- The Illinois Dept. of Revenue has asserted a Priority Claim of $121,521,24 *See* Anada Case, POC No. 2. This claim will be paid within thirty (30) days after the Effective Date.

- The Georgia Dept. of Revenue has asserted a Priority Claim of $1,107.73. *See* Anada Case, POC 5.

- The Wisconsin Dept. of Revenue has asserted a Priority Claim of $50.00. *See* Anada Case, POC No. 17.

- Anada scheduled the North Carolina Dept. of Revenue with a $217.00 Priority Claim. *See* Anada Case, ECF No. 63.

b.    Administrative Expense Claims

The Administrative Claims against Anada are as follows:

- Camber Road asserted a $514,525.66 claim against the Debtors. *See* Dkt. No. 506. The Plan Proponents initially disputed the amount of that claim, but this dispute has also been resolved. As part of that resolution, Camber Road will hold a $360,000 administrative expense claim, jointly and severally, against the Debtors. *See* Dkt. Nos. 547.

- It is anticipated that Krekeler Law will assert a claim for accrued but unpaid professional fees of approximately $40,000. Any claim asserted by Krekeler Law will be subject to review by the United States Trustee and approval by the Bankruptcy Court.

- It is anticipated that Goosman Law Firm will assert a claim for accrued but unpaid professional fees of approximately $40,000. Any claim asserted by Goosman Law will be subject to review by the United States Trustee and approval by the Bankruptcy Court.

- Anada may owe quarterly fees to the United States Trustee, but any such amount has not yet been determined.

- The bar date for asserting administrative expense claims has not passed. Additional administrative expense claims may yet be filed.

E.        **N̲O̲N̲-̲P̲R̲I̲O̲R̲I̲T̲Y̲ ̲U̲N̲S̲E̲C̲U̲R̲E̲D̲ ̲C̲L̲A̲I̲M̲S̲**

Crimson estimates that its unsecured creditors are owed approximately $2,986,807.81 in the aggregate pursuant to Crimson's Schedules. *See* Crimson Case, Dkt. No. 47. Other creditors have filed additional claims, including residents of the City of Adrian who have filed claims based on odors allegedly emitted from Crimson's facility. These filed claims have increased the amount of claims asserted against Crimson by $1,545,760. The Debtors have not investigated the merits of the individual claims by residents of the City of Adrian.

Ova estimates that its Unsecured Creditors are owed approximately $5,312,000 in the aggregate pursuant to Ova's Schedules. *See* Dkt. No. 42. Other creditors have filed or may file claims that may increase the amount asserted against Ova.

Anada estimates that its Unsecured Creditors are owed approximately $1,917,526 in the aggregate pursuant to Anada's Schedules, excluding the $9.5 million originally claimed by IsoNova that has been resolved and expunged. *See* Dkt. No.63. Other creditors have or may file claims that may increase the amount asserted against Anada.

Each of the Debtor's estimates may increase or decrease in the event that contracts are rejected or if the Court overrules or sustains claim objections that have yet to be filed. The Plan Proponents reserve all of their rights and objections with respect to all claims.

A listing of each Debtor's unsecured creditors and their claims is on file with the Bankruptcy Court.

F.    **G**UARANTEED **D**EBT

To the best of the Plan Proponents' knowledge, Rettig, Anada's CEO and President, likely guaranteed or is co-liable on other obligations owed by one or more of the Debtors.

The Crimson Committee asserts that (i) the now withdrawn claims of IsoNova were guaranteed by Rettig, Mrs. Rettig, and Anada's non-filing subsidiaries, (ii) Rettig also personally guaranteed the alleged obligations of Anada and Ova owing to Balanced Management.  Claims against Rettig and Mrs. Rettig may have no value because they filed a joint chapter 7 bankruptcy case.  *See In re Rettig*, Case No. 24-12157-rmb (Bankr. W.D. Wis.).

V.    **IMPLEMENTATION OF PLAN**

The Debtors anticipate that the Liquidation Trustee, as assignee of Causes of Action, may commence Avoidance Actions, including preference actions under 11 U.S.C. § 547, fraudulent transfer claims under 11 U.S.C. § 548, and any claim described in this Disclosure Statement as well as related actions under state law equivalents.

Importantly, litigation is inherently risky and there is no certainty that a recovery can or will be had in any Cause of Action.  There is no certainty that litigation will yield any additional funds to be distributed to holders of claims against the Debtors.

A.    **F**INANCIAL **I**NFORMATION

1.    **Pre-Petition Financial Summaries**

The Plan Proponents have attached as **Exhibit V(A)(1)**, financial summaries relating to the three fiscal years prior to the Petition Date.  These documents summarize the Debtors' financial history prior to the commencement of the Debtors' Cases. The Debtors' operations were consolidated for tax purposes. The Plan Proponents submit that the Pre-Petition Financial

Summaries are not material to the evaluation of the Plan, as the Debtors' businesses and assets have been sold.

**2.     Post-Petition Financial Summaries**

The Debtors refer parties to summaries of the Debtors' financial performance during this chapter 11 proceeding filed by the Debtors in the Chapter 11 Cases. Those "monthly operating reports" summarize the financial condition relating to the Debtors' post-petition operations. Copies of the most recent monthly operating reports for each Debtor are attached as **Exhibit V(A)(2)**. The source of these summary is the Debtors' books and records. Notwithstanding anything contained herein to the contrary, the past performance of the Debtors is not indicative of future performance because the Debtors' operating assets and business have been sold pursuant to § 363 of the Bankruptcy Code.

**3.     Liquidation Analysis**

The Plan Proponents' Liquidation Analysis, prepared from the Debtor's Schedules and records, is attached as **Exhibit V(A)(3)**.

If the Plan is not accepted by the creditors or is not otherwise confirmed by the Bankruptcy Court, the Plan Proponents believe that the Debtors' assets would be liquidated in a straight bankruptcy liquidation under Chapter 7 of the Bankruptcy Code resulting in a substantial increase in administrative costs and may cause the loss of certain rights to object to validity, priority, and amount of Liens and Claims.

**4.     Post-Confirmation Projections**

The Plan Proponents have attached as Exhibit **V(A)(4)**, their summary of the post-confirmation financial projections over the life of the Plan. The Plan Proponents have estimated the fair market value of the Debtors' assets remaining after the Sale authorized by the Sale Order. Id.

Furthermore, the Plan Proponents believe, but cannot guarantee, that as a result of the collection from the Debtors' remaining assets and the Causes of Action that may be initiated, creditors will receive a distribution. The Debtors anticipate, but cannot guarantee, that actual performance will be in-line with that prediction. The Causes of Action may be dismissed, unsuccessful, result in negligible or less than anticipate recoveries, or otherwise limited for a variety of reasons. Also, events outside of the Debtors' or Liquidation Trustee's control could prove projected recoveries to be in error. These events may include, without limitation, changes in the current economic environment, increased costs, the effect of pandemics (such as the coronavirus), and changes due to the political and regulatory environment. Actual post-confirmation performance may vary from the projected post-confirmation performance.

The Plan will be funded from Cash on hand, proceeds from the sale of assets, as well as proceeds, if any, from Causes of Action that may be pursued by the Liquidation Trustee.

**B.** **TAX RAMIFICATIONS**

**1.** **To Debtors**

The Plan Proponents believe that the forgiveness of indebtedness which may result from a discharge granted by the confirmation of the Plan will not result in a significant tax consequence to the Debtors. The forgiveness of indebtedness, pursuant to the Internal Revenue Code, can be applied either to the Debtors' basis in their respective assets or to their net operating loss carry forward. The Plan Proponents cannot accurately determine the  amount and extent of any forgiveness of indebtedness. First, the parties must determine if all of the Claims that have been filed, or deemed filed within these Chapter 11 Cases, are accurate. Also, depending on whether the Debtors' current fiscal year results, the Debtors may elect to apply any forgiveness of a debt in this directly to its basis. Despite the fact that the Plan Proponents believe that the Debtors can either (a) apply such forgiveness of indebtedness to their net operating loss carry forward or (b) to their basis it is not expected that the amount of forgiveness of debt will be totally offset by the foregoing.

However, once these net operating losses are used by the Debtors to offset forgiveness of indebtedness, they cannot be used again. Taxes paid by the Debtors in the future years would, therefore, be impacted as a result of confirmation of the Plan.

**2.**     **To Creditors**

The tax consequences to each creditor resulting from confirmation of the Plan may vary depending upon each creditor's particular circumstances. The Plan Proponents recommend that creditors or holders of claims obtain independent tax professional to advise them as to the tax consequences of the Plan.

## VI.    LEGAL REQUIREMENTS

### A.    VOTING PROCEDURES

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interests, that are impaired under the Plan. Accordingly, classes of claims or interests that are not impaired are <u>not</u> entitled to vote on the Plan. Similarly, classes of claims or interest that are deemed to reject the Plan (because they receive nothing under the Plan) are not entitled to vote on the Plan. Votes on the Plan will be counted only with respect to claims (a) that are not listed on the Debtor's Schedules of assets and liabilities as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the Plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the Plan and Disclosure Statement, each holder of a claim in a voting class of the Plan should vote on the enclosed ballot either to accept or to reject the Plan, and then return

the ballot by the deadline and location(s) to be established by the Court. Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the counsel for the Plan Proponents.

### B.    ACCEPTANCE

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class will be deemed to have accepted the Plan.

### C.    CONFIRMATION

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are these: 1) Each class of impaired creditors and interest must accept the plan, as described in VI.B above or, 2) Either each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

### D.    MODIFICATION

The Plan Proponents reserve the right to modify or withdraw the Plan at any time before confirmation or the Effective Date of the Plan.

E.    <u>EFFECT OF CONFIRMATION</u>

If the Plan is confirmed by the Court:

1.    Its terms are binding on the Debtors, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the Plan.

2.    Except as provided in the plan, claims against a corporation that is liquidating and not continuing in business are not subject to a discharge but may be subject to an injunction.

F.    <u>ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN</u>

The Plan Proponents believe that the Plan affords holders of claims and interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, however, the theoretical alternatives include (A) confirmation of an alternative plan or plans of liquidation; or (B) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

If the Plan or any other chapter 11 plan for the Debtors cannot be confirmed under section 1129(a) of the Bankruptcy Code, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which event a trustee (or trustees) would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. A chapter 7 trustee, who would lack the Debtors' knowledge of their affairs, would be required to invest substantial time and resources to investigate the facts underlying the multitude of Claims filed against the Debtors' estates. If a trustee is (or trustees are) appointed and the remaining assets of the Debtors are liquidated under chapter 7 of the Bankruptcy Code, all creditors holding Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims may receive distributions of a lesser value on account of their Allowed Claims and likely would have to wait a longer period of time to receive such distributions. A liquidation under chapter 7 likely would result in smaller distributions made to creditors than that provided for in the Plan because of a number of factors, including, but not limited to (i) additional Administrative

Claims generated by conversion to a chapter 7 case, (ii) the administrative costs of liquidation, (iii) associated delays in connection with a chapter 7 liquidation, (iv) the low likelihood that recoveries on assets (including litigation assets) will be maximized in a chapter 7 case, and (v) additional Claims, some of which would be entitled to priority, which would be generated during the chapter 7 liquidation process.

## VII.    RECOMMENDATION AND CONCLUSION

This Disclosure Statement is subject to approval by the Bankruptcy Court, and the Plan Proponents believe that the Disclosure Statement contains information adequate to permit Holders of Claims to make an informed judgment about the Plan.

The Debtors believe that Confirmation and consummation of the Plan is in the best interests of the Debtors, their Estates and their creditors.  The Plan provides for an equitable distribution to creditors.  The Plan Proponents believe that any alternative to Confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation and additional costs, as well as a reduction in the distributions to Holders of Claims in certain Classes. Consequently, the Plan Proponents urge all eligible Holders of Impaired Claims to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED by the on or before the voting deadline.

Dated: March 7, 2025.


**KREKELER LAW, S.C.**

/s/Kristin J. Sederholm

By:_____
       Kristin J. Sederholm, State Bar No. 1001895
       Attorneys for the Debtors in Possession,
       Anada, Inc., OvaInnovations, LLC, and
       Crimson Holdings, LLC

**Address:**
**26 Schroeder Court, Suite 300**
**Madison, WI  53711**
**Phone:  608-258-8555**
**Fax:  608-258-8299**
**ksederho@ks-lawfirm.com**

# Exhibit V(A)(1):

[To be supplemented]

# Exhibit V(A)(2):

# [To be supplemented]

# Exhibit V(A)(3):

## [To be supplemented]

# Exhibit V(A)(4):

[To be supplemented]